**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| D.B., | | CIVIL ACTION |
| | Plaintiff, | |
| | v. | |
| TREDYFFRIN/EASTTOWN SCHOOL | | NO.  17-2581 |
| DISTRICT, and | | |
| AMY A. MEISENGER, | | |
| | Defendants. | |

DuBois, J.                                                                   October 23, 2020

**M E M O R A N D U M**

## I.   INTRODUCTION

This case arises out of the sexual assault of plaintiff, D.B., by Arthur Phillips, an

instructional aide at Conestoga High School in the Tredyffrin/Easttown School District, where

D.B. was a tenth-grade student.  D.B., asserts claims under 42 U.S.C. § 1983 against

Tredyffrin/Easttown School District ("TESD") and Dr. Amy A. Meisinger, the principal of

Conestoga High School ("CHS"), and a claim under Title IX of the Education Amendments of

1972, 20 U.S.C. § 1681*, et. seq.* ("Title IX") against TESD.[1]  Presently before the Court is

Defendants' Motion for Summary Judgment.  For the reasons that follow, the Motion is granted

in part and denied in part.

## II.   BACKGROUND[2]

Plaintiff, D.B., was a sophomore at CHS during the 2016/2017 school year.  Defendants'

---

[1] Plaintiff's parents, A.B. and C.B., filed this lawsuit on behalf of D.B. when she was a minor.  D.B. was named as plaintiff and A.B. and C.B. were removed from the case when D.B. reached the age of majority.  Order Amending Caption (Document No. 38, filed July 22, 2019).

[2] The facts are presented in the light most favorable to plaintiff.  Disputed facts are noted as such.  Where appropriate, plaintiff and the defendants' statements of material facts are cited in lieu of a direct citation to the record.

Statement of Material Facts ("Def.'s SMF") ¶ 7.  Defendant Meisinger has been principal of CHS since 2009.  Meisinger Dep. 12:20-13:1.

### A.  D.B. meets Phillips during the fall 2016 semester.

During her freshman year, D.B. was enrolled in a class with CHS art teacher Piera Raffaele.  D.B. Dep. 32:4-5.  During the fall semester of D.B.'s sophomore year, the 2016/2017 school year, the two started a Pilates club, and D.B. frequently ate lunch with Ms. Raffaele.  Def.'s SMF ¶ 8.  Through these lunches, D.B. met Arthur Phillips, an instructional aide in the CHS TV studio.  Def.'s SMF ¶ 9.   The group continued to have lunch together in the TV studio almost every day.  D.B. Dep. 39:5-16.  Under CHS regulations, students were not permitted to eat lunch outside the cafeteria.  Meisinger Dep. 34:11-35:9; DiLella Dep 40:17-41:14.

Phillips first reached out to D.B. outside of lunchtime early in the fall semester of that year by sending her an email stating that he was "watching" her.  D.B. Dep. 12:13-13:11.  The next day, D.B. "loudly" brought up the email during lunch.  D.B. Dep. 15:10-16:8.  At least one staff member, TV studio aide Alex Azar, was present, but D.B. does not know if he heard the conversation.  D.B. Dep. 15:22-16:1.

After the email, Phillips followed D.B. around the school.  She testified to seeing him outside her classrooms during her classes and in between periods.  D.B Dep. 17:1-12.  On one occasion, a student in D.B.'s math class told her Phillips was in the hallway watching her.  D.B. Dep. 18:2-6.  In response, D.B. twice "yelled" that Phillips was "stalking" her.  D.B. Dep. 19:9-15.  D.B. testified her math teacher, Seth Shore, was present but did not respond.  D.B. Dep. 18:10-12.

On another occasion, Phillips "kicked [D.B.'s] butt."  D.B. Dep. 43:9-11.  In response, D.B. told Phillips she felt violated.  D.B. Dep. 43:13-14.  D.B. testified that Mr. Azar and Ms. Raffaele both witnessed the event.  D.B. Dep. 43:17-21.

Sometime during the fall of 2016, Phillips allowed D.B. to drive his car in the parking lot of the school during school hours.  D.B. Dep. 121:1-122:17.  D.B. told her mother, C.B., about this in January 2017.  Def.'s SMF ¶ 14.  C.B. attempted to call CHS Assistant Principal Anthony DiLella to report the incident at that time, but she hung up without leaving a message and did not call back.  Def.'s SMF ¶ 14.  D.B. drove Phillips's car on at least two other occasions.  D.B. Dep. 121:10-11.

In December 2016, D.B. and C.B. were out shopping and purchased gifts for Ms. Raffaele and Phillips.  Def.'s SMF ¶ 10.  Plaintiff denies that C.B. knew the second gift, a man's belt, was for Phillips.  Pl.'s SMF ¶ 10; C.B. Dep. 38:17-40:16.

**B.  Phillips's grooming behavior escalates during the spring semester.**

At some point during the 2016/2017 school year, D.B. thought she lost her cell phone during the school day and used Phillips's phone to find it.  Pl.'s Resp. ¶ 11.  This allowed Phillips to save D.B.'s cell phone number.  Pl.'s Resp. ¶ 11.  Phillips began communicating via text message with D.B., in violation of TESD policies and regulations.  Def.'s SMF ¶ 11; Def.'s Ex. S (TESD Policy and Regulation 4344, "Electronic Communications between Employees and Students"); Def.'s Ex. T (TESD Policy and Regulation 5461, "Maintaining Appropriate Boundaries with Students").[3]  In January 2017, C.B. saw a text from Phillips on D.B.'s phone.  Def.'s SMF ¶12.  C.B. did not know the text was from Phillips at the time.  Pl.'s Resp. ¶ 12.

---

[3] Policy and Regulation 4344 were in force when Phillips began texting D.B.  Def.'s Ex. S (TESD Policy and Regulation 4344, "Electronic Communications between Employees and Students").  In February 2017, TESD enacted Policy and Regulation 5461 and repealed Policy and Regulation 4344.  Cataldi Dep. 41:15-19; Pl.'s Ex. HH (Email to Staff).  See Section II. F., *infra*, for discussion of those policies and regulations.

On January 19, 2017, Phillips called D.B. on her cell phone while she was walking her dog and drove to her neighborhood.  D.B. Dep. 56:9-60:19.  D.B. testified that she was "confused" and complied when he told her to get in the car.  D.B. Dep. 56:9-58:19.  Once in the car, Phillips kissed D.B.  D.B. Dep. 58:20-59:6; Def.'s SMF ¶ 16; Pl.'s Ex. R ("Police Criminal Complaint) at 1-12.  D.B. told another student but did not tell her parents, teachers, or school administrators.  Def.'s SMF ¶ 16; Pl.'s Resp. ¶ 16.

In February 2017, Phillips requested a copy of D.B.'s schedule from the attendance secretary, Anna Fillippo.  Pl.'s Ex. X.  Less than two months later, Phillips requested a second copy.  Pl.'s Ex. X.  In the second email to Ms. Fillippo, he wrote,

> Need [D.B.]'s schedule again.  She keeps deleting it from my desktop.
>
> This time I'll put in my password protected folder.

Pl.'s Ex. X.  Ms. Fillippo did not report this request to anyone.

D.B. continued to eat lunch regularly with Ms. Raffaele and Phillips.  D.B. Dep. 87:5-89:4.  Susan Gregory, a teacher who taught classes in the TV studio, noticed D.B. in the TV studio twice and warned Phillips that it was a violation of school regulations to allow students to eat in the TV studio.  Gregory Dep. 58:21-59:27; 66:19-68:1.  Jane McGregor, a substitute teacher who sometimes joined these lunches, later described Ms. Raffaele, Phillips, and D.B. as a "lust triangle" and testified that she observed several "red flags" during their interactions.  McGregor Dep. 48:9-50:8.  On one occasion, Ms. McGregor overheard a student refer to another student as "Art's girlfriend," but did not follow up or report the comment.  McGregor Dep. 114:10-116:2.

4

Phillips frequently took D.B. to get food or ice cream, often from Wawa, during the lunch period.[4]  D.B. Dep. 87:5-88:13.  A second student, E.H., would sometimes join them.  D.B. Dep. 88:4-8.  Ms. Raffaele denied knowing that D.B. accompanied Phillips to Wawa, Raffaele Dep. 31:13-18, but D.B. testified that Ms. Raffaele would often ask D.B. to bring food back for her. D.B. Dep. 89:1-15.  D.B. testified that the three security guards who sit at the front desk of the school, including Kari Galie, knew Phillips was taking D.B. off campus for food.  D.B. Dep. 102:22-103:10.  D.B. testified that one of the guards stated, "[A]s long as they're not in any danger, I don't care."  D.B. Dep. 103:6-7.  D.B. further testified that Ms. McGregor was "upset" and told D.B. and Phillips that they should not leave for lunch and that Ms. McGregor talked to another teacher, Leanne Argonish, about it.  D.B. Dep. 103:24-104:4.

D.B. testified that Mr. Azar was also aware Phillips was taking D.B. and E.H. off-campus for lunch.  D.B. Dep. 102:15-21.  D.B. testified that, on one occasion, Mr. Azar said to D.B., "[W]hat would happen if a police officer stops Art and he finds two young girls in his car[?]" D.B. Dep. 103:15-21.  D.B. also testified she and Phillips sometimes brought food back for Mr. Azar.  D.B. Dep. 112:15-113:5.  Mr. Azar testified that he did not know Phillips took D.B. off-campus to get food for lunch.  Azar Dep. 69:6-15.

D.B. also frequently skipped class to spend time with Phillips in the TV studio.[5]  Pl.'s Ex. V.  At least one student reported that he informed Mr. Azar that D.B. was skipping class, and Mr. Azar directed D.B. to return to class.  Pl.'s Ex. V.  Phillips told D.B. and the other students that D.B. was allowed to be in the TV studio.  Pl.'s Ex. V.  D.B.'s English teacher, Mary Elizabeth

---

[4] One Wawa trip was recorded by a handheld school camera.  The video footage shows Phillips and two female students leaving the school building and then, later, returning carrying Wawa bags and cups.  Gregory Dep. 18:22-19:12; *see also* Pl. Resp. Brief at 17.

[5] Phillips also took D.B. on trips to the King of Prussia Mall, a Home Depot Store, Sweet Charlies in Philadelphia, the Valley Forge Casino, and iFly Sky Diving center.  D.B. Dep. 90:3-94:3.  Some trips took place during lunch time, some trips required D.B. to skip her eighth period class, and some trips took place at the end of the school day. D.B. Dep. 94:17-94:24.

Talian, testified that she received multiple hall passes signed by Phillips allowing D.B. to be late to or miss class.  Talian Dep. 21:3-21:13.

Ms. Raffaele stated in her police interview that she and Mr. Azar had a conversation about how D.B. was "hanging out at the TV studio a lot" and how D.B. and Phillips "were together a lot."  Pl.'s Ex. S (Raffaele DA Tr.) 7:17-8:16.  D.B. testified she repeatedly told Ms. Raffaele that she "hated" Phillips. D.B. Dep. 173:9-14.  In response, Ms. Raffaele would laugh and say, "[N]o, you love him."  D.B. Dep. 173:18-23.

Ms. Raffaele attended three meals with Phillips and D.B. off the school campus at the end of the school day.  Raffaele Dep. 100:14-101:9.  On some of these occasions, Ms. Raffaele drove D.B. to and from the restaurants, and other times Phillips did so.  Raffaele Dep. 101:3-111:15.  On at least one occasion, Ms. Raffaele's husband, Dr. Jack Fitzgerald, joined them.  Raffaele Dep. 110:24-111:3.

D.B. told Ms. Raffaele that her parents had given her permission to leave campus for meals with her.  Raffaele Dep. 112:2-15.  However, Ms. Raffaele did not contact D.B.'s parents to confirm that statement.  Raffaele Dep. 112:20-24; 116:20-117:18. Later, C.B. became aware that Ms. Raffaele and Dr. Fitzgerald had taken D.B. out for a meal after school on at least one occasion.  C.B. Dep. 64:21-66:3.  Dr. Fitzgerald was C.B.'s dentist, and C.B. thanked him for being "nice" to D.B.  C.B. Dep. 64:21-66:3.  C.B. was not aware that Phillips attended.  C.B. Dep. 64:21-66:3.[6]

On March 10, 2017, Phillips sent himself an email stating that the CHS Department Chair for Technology and Engineering, Noah Austin, saw him touching D.B. The email reads,

> Today noah walked in on me holding [D.B] to have [J.L.] put snow
> down her back.

---

[6] Ms. Raffaele's employment with TESD was later terminated due to her violations of TESD policy.  Raffaele Dep. 246:22-247:1; 282:13-283:3.

> If you want an out blame it on him. [D.B.], Noah took me aside &
> talked to me about the incident. He tried toget [sic] to me b4 I left
> Friday, but had to wait til this week.

Pl.'s Ex. T.  D.B. testified that she remembers Mr. Austin walking in on the incident and that

Phillips told her Mr. Austin was "mad" when he discussed it with Phillips.  D.B. Dep. 140:16-

142:16.  Mr. Austin testified that he does not remember the incident.  Austin Dep. 26:3-14.

C.B. testified that Dr. Christine Dunleavy, a mental health specialist at CHS, told her that

Assistant Principal DiLella told Assistant Principal James Bankert that he witnessed Phillips pull

D.B. into a classroom.  C.B. Dep. 131:10-132:9; 143:1-143:24.  According to C.B.'s testimony,

Dr. Dunleavy told her Assistant Principal DiLella stated that the incident "made the hair on the

back of his neck stand up."  C.B. Dep. 131:11-22.

Defendants contend that the events—the claimed pulling of D.B. into a classroom by

Phillips and the related conversations—did not occur, and the story was "manufactured" by C.B.

Def.'s Opening Br. at 13.  Assistant Principal DiLella, Assistant Principal Bankert, and Dr.

Dunleavy all deny having any knowledge of this incident.  DiLella Dep. 207:22-208:23; Bankert

Dep. 96:15-24; Dunleavy Dep. 175:13-177:24.  D.B. testified that she could not recall this

incident at the time of her deposition but that she remembered Dr. Dunleavy telling her about it.

D.B. Dep. 137:21-138:6; 144:14-145:11.

**C.  Staff members notice changes in D.B.**

At least two staff members noticed changes in D.B. during the spring semester.

Ms. Talian testified that she saw a change in D.B.'s "affect" in spring 2017, including behavioral

problems.  Talian Dep. 53:18-20; 57:18-19.  At some point, D.B. approached Ms. Talian to talk.

Talian Dep. 54:17-55:4.  Ms. Talian testified that D.B. told her she had some mental health

concerns and family problems.  Talian Dep. 55:5-22.  D.B. testified that she told Ms. Talian in

fall of 2016 that "something very terrible is happening to [her]."[7]  D.B. Dep. 75:8-9.  Ms. Talian recommended D.B. talk to her guidance counselor.  Talian Dep. 59:18-23.  Ms. Talian later asked D.B.'s guidance counselor if D.B. had discussed the concerns with her, but the guidance counselor reported D.B. had only come to ask for a letter of recommendation.  Talian Dep. 59:4-17.  Ms. Talian did not follow up with D.B. or report the change in D.B.'s affect and her lateness to class.  Talian Dep. 56:1-11.

Assistant Principal Bankert disciplined D.B. for three infractions in March and April of 2017.  Bankert Dep. 31:13-16.  These were D.B.'s only disciplinary referrals up until that point in the year, and Assistant Principal Bankert testified that he "was worried that there might be something going on that's a stressor for her."  Bankert Dep. 50:15-20.  D.B. testified that she told Assistant Principal Bankert that "something terrible" was happening to her and that she was trying to fix it, but it was causing her problems.  D.B. Dep. 77:24-78:3.  On Monday, April 3, 2017, after D.B.'s third disciplinary referral, Assistant Principal Bankert suggested she speak to Dr. Dunleavy.  D.B. Dep. 78:12-18; Bankert Dep. 44:7-12; 52:14-54:17.

Assistant Principal Bankert told Dr. Dunleavy that he wanted D.B. to talk to her. Dunleavy Dep. 23:14-24:12.  Dr. Dunleavy testified that Assistant Principal Bankert told her he was referring D.B. to her because of the way she "presented" in his office but that he could not explain his concern in "concrete" terms.  Dunleavy Dep. 23:23-24:9.  Dr. Dunleavy did not immediately respond, but she called D.B. to her office four days later, on Friday, April 7, 2017. Dunleavy Dep. 24:13-24:24; 28:16-18.  Dr. Dunleavy met with D.B. for between eighty-three

---

[7] D.B. testified that this conversation occurred in the fall, halfway through the second marking period.  D.B. Dep. 76:6-10.  Ms. Talian testified that it occurred in the spring semester, around February.  Talian Dep.  53:8-17; 54:17-21.

8

minutes and two hours.[8]  Dunleavy Dep. 30:17-20.  Assistant Principal Bankert testified that he followed up with Dr. Dunleavy, Bankert Dep. 63:13-64:1, but Dr. Dunleavy testified that they did not follow up with each other.  Dunleavy Dep. 30:21-32:23.  Assistant Principal Bankert did not follow up with D.B.  Bankert Dep. 63:13-64:1

Assistant Principal Bankert also called C.B. to express his concern that D.B. had three disciplinary referrals within two-and-a-half weeks.  Bankert Dep. 48:1-20.  C.B. testified that Assistant Principal Bankert told her "there was something in [D.B.'s] eyes" that made him want her to talk to the school's mental health specialist.  C.B. Dep. 95:5-26.

**D.  Phillips is investigated and arrested.**

The week after D.B. met with Dr. Dunleavy was TESD's spring break.  Dunleavy Dep. 31:1-2.  That week, on April 11, 2017, C.B. testified that she saw an SUV near the bottom of her driveway and that D.B. was talking to a man inside the SUV.  C.B. Dep. 85:1086:11. C.B. unsuccessfully attempted to follow the SUV as it drove away.  C.B. Dep. 86:9-88:12.  D.B. would not tell C.B. the identity of the man driving the SUV, but C.B. eventually learned it was Phillips.  C.B. Dep. 91:11-91:12; 107:6-15.

On April 18, 2017, the first day of school after spring break, C.B. and A.B., D.B.'s father, went to CHS to meet with Assistant Principal DiLella about this incident, the fact that Phillips allowed D.B. to drive his car, and the text messages she saw on D.B.'s phone that she believed may have been from Phillips.  C.B. Dep. 100:3-101:17.  After speaking with D.B., school administrators removed Phillips from CHS for violating TESD policy by allowing D.B. to drive his car.  Meisinger Dep. 105:7-106:24.  During a second meeting with A.B. and C.B., school administrators determined the relationship between Phillips and D.B. might have been sexual and

---

[8] A period at CHS is forty-three minutes long, and Dr. Dunleavy testified she met with D.B. for "about two classes," or "approximately eighty-three minutes to two hours."  Dunleavy Dep. 30:17-31:8.

reported it to the Tredyffrin Township Police and Child Line, the Pennsylvania state child abuse reporting system.  Meisinger Dep. 110:2-15; 112:2-21.

The Tredyffrin Township Police Department conducted a criminal investigation into Phillips's sexual misconduct.  When interviewed by police, Mr. Austin stated that Phillips was known as a "creepy dude" who made female teachers uncomfortable.  Pl.'s Ex. P (Austin DA Tr.) 23:17-24:7.  He specifically recommended the police speak to CHS teacher Katie Wilson because "after the news broke, she said that she wished that she had made light to the administrators that she felt uncomfortable about some of the things that he had said to her."  Pl.'s Ex. P (Austin DA Tr.) 29:8-18.

The police investigation disclosed extensive sexual abuse of D.B. by Phillips, as a result of which Phillips was arrested.  Def.'s SMF ¶ 41.  According to the Criminal Complaint, between January 2017 and April 2017, Phillips "groped, kissed, and touched [D.B.'s] breast and vaginal area outside of her clothing" between twenty and forty times, "performed[ed] oral sex on" her at least twenty times, "digitally penetrated [her] with [his] hands, tongue, and fingers," and "exposed his penis" to her.  Police Criminal Compliant at 10.  The Criminal Complaint went on to charge that Phillips repeatedly had sexual intercourse with D.B. in March 2017 and April 2017.  Police Criminal Complaint at 10.

The Criminal Complaint charged Phillips with 101 counts related to his sexual assault of D.B.  Police Criminal Complaint at 4-7.  He ultimately pled guilty and was imprisoned.  Def.'s SMF ¶ 41.  While in custody, he committed suicide.  Def.'s SMF ¶ 41.

D.B. attended CHS for the rest of her sophomore year and her junior year, but she ultimately transferred to another school before her senior year. D.B. Dep. 285:9-10.

### E.  Other incidents of sexual misconduct occurred at CHS.[9]

Plaintiff alleges that, in the twelve years prior to this incident, there were three other incidents of sexual abuse of a student by a teacher at CHS.

#### 1.  Christine Towers

In April 2016, Christine Towers, a softball coach and former aide at CHS, was arrested for having a sexual relationship with a sixteen-year-old male student.  Pl.'s Ex. A.  Towers was employed as an aide at TESD from September 2014 through February 2016, at which time she resigned from the position.  Pl's Ex. A.  As a softball coach, Towers was still an employee of TESD when she was arrested in April 2016.  Pl.'s Exs. B, C, and D.

Towers began her sexual misconduct with the student while "giving the Victim one-on-one tutoring at Conestoga High School."  Pl.'s Ex. B.  Towers communicated with the victim "various written messaging communications," including text messages.  Pl.'s Ex. B. at 5.  She took the victim off school property to restaurants, museums, and the Philadelphia Zoo.  Pl.'s Ex. B at 15.

#### 2.  Jonathan Goodman

In 2007, CHS teacher Jonathan Goodman was accused of sexual harassment.  Pl.'s Ex. E.  The accused misconduct included making sexual, sexist, and otherwise inappropriate comments and allowing male students to make inappropriate comments in class.  Pl.'s Ex. E.  He also used

---

[9] In addition to the teacher misconduct, D.B. identifies two recent incidents of sexual misconduct by students in the TESD.  In November 2015, middle school students in the TESD distributed sexually explicit images of classmates. *See* Justin Heinze, *Tredyffrin Students Allegedly Had Pornographic Images Of Middle School Classmates*, Nov. 12, 2015, available at https://patch.com/pennsylvania/te/tredyffrin-students-allegedly-had-pornographic-images-middle-school-classmates-cops.  Three students were charged with distributing pornographic pictures and videos.  Pl.'s Br. at 8.  In March 2016, a CHS student on the football team made allegations of hazing that involved sexual harassment and assault.  Pl.'s Br. at 8; Def.'s Opening Br. at 9.  The student later recanted the allegations.  Def.'s Opening Br. at 9.

his personal cell phone to text message female students.  Pl.'s Ex. E.  Following an investigation, Goodman was suspended twice and prohibited from holding extracurricular positions at CHS, but he is still a teacher at the school.  Meisinger Dep. 165:15-167:4.

Defendant Principal Meisinger was an assistant principal at the time and participated in the investigation.  Meisinger Dep. 159:5-23.  During her deposition, she testified that she did not know whether his conduct "me[t] th[e] bar" of sexual harassment, and she did not know whether he was suspended for the incident.  Meisinger Dep. 165:19-166:1; 171:16-172:12.  Principal Meisinger also testified she did not know if his disciplinary restriction was still in place. Meisinger Dep. 166:23-169:4.

### 3.  *Christopher Genovese*

In 2005, Christopher Genovese, a music teacher at CHS, was arrested for having a sexual relationship with a female student.  Pl.'s Ex. K.  Investigative reports state that Genovese had an "unusually close" relationship with the student; the student did not have Genovese for class but spent time in his classroom; Genovese sent sexually provocative emails to the student; and Genovese took the student off the school premises. Pl.'s Ex. K.  Two other teachers were aware of some of the misconduct but failed to report it.  Pl.'s Ex. K.

Dr. Richard Gusick, the superintendent of TESD, was an assistant principal at CHS at that time.  Gusick Dep. 129:6-130:8.  Principal Meisinger did not work for TESD at that time but learned of the incident when she was hired later that year.  Meisinger Dep., 155:7-156:11.

**F.  TESD recently changed its policies and regulations.**

Prior to the 2016/2017 school year, TESD had two policies that addressed harassment. Policy 4330, "Harassment by and of District Employees," "requires that any individual who sees

or suspects such harassment [ ] inform a district administrator."[10]  Def.'s Opening Br. at 24; Def.'s Ex. I.  Policy 5420, "Harassment of Students by Non-Students," "specifically details what constitutes harassment of students, and defines 'sexual harassment.'"  Def.'s Opening Br. at 24; Def.'s Ex. J.  These policies were in place before the sexual misconduct by Genovese, Goodman, Towers, and Phillips.  Def.'s Opening Br. at 24.  They were posted on the TESD website, and teachers received copies as part of the faculty handbook.  Def.'s Opening Br. at 24.

Prior to February 27, 2017, TESD did not have a written policy that specifically addressed "precursor misconduct."  Cataldi Dep. 43:8-44:3.  In December 2016, after Towers was arrested, TESD began drafting Policy 5461, "Maintaining Appropriate Boundaries with Students."  Cataldi Dep. 34:16-36:16.  The TESD School Board first reviewed a draft of the policy on January 19, 2017.  Cataldi Dep. 42:6-24.  It was adopted on February 27, 2017, while Phillips's misconduct with D.B. was ongoing.  Cataldi Dep. 70:23-72:11.  The policy defines precursor misconduct as "the targeting of a student by an adult through various modes of communication with the intention of promoting or engaging in sexual activity with the student."  Def.'s Ex. T (TESD Policy and Regulation 5461, "Maintaining Appropriate Boundaries with Students").

Policy 5461 and its associated regulation, Regulation 5461, were circulated to TESD staff via email on March 1, 2017.[11]  Cataldi Dep. 76:7-18; Pl.'s Ex. HH (Email to Staff).  In the email, TESD did not direct employees to review the policy.  Pl.'s Ex. HH (Email to Staff).  TESD did not "track whether a staff member or teacher, administrator actually open[ed] the PDFS that

---

[10] Defendants also assert that Policy 4330 "identifies and defines sexual harassment."  Def.'s Opening Br. at 24. However, the copy of the policy and associated regulation provided in their attached exhibits does not include a definition of sexual harassment.  See Def.'s Ex. I.

[11] Policies are created by the TESD Policy Committee and approved by the TESD School Board. Cataldi Dep. 52:2-13.  Regulations are created and changed by TESD administration. Cataldi Dep. 52:2-13.

[were] attached" to the email, nor did it have teachers and staff sign a certification indicating that they reviewed the new policy.  Cataldi Dep. 78:4-14; 80:13-81:8; 132:19-133:5.  Principal Meisinger testified that she did not follow up with a reminder or announcement about the policy to the teachers and staff.  Meisinger Dep. 124:8-15.  As March 1, 2017, TESD did not have plans to train its employees on the policy and associated regulation, but "[t]here was discussion" about future training.  Cataldi Dep. 84:22-86:7.

TESD did not provide training on Policy and Regulation 5461 prior to Phillips' arrest. DiLella Dep. 204:4-205:22.  TESD asserts that the content of Policy and Regulation 5461 were covered in previous training programs.  Gusick Dep. 78:7-79:9.  Dr. Dunleavy testified in May 2019 that she did not know what precursor misconduct was.  Dunleavy Dep.  168:12-188:10. Ms. Raffaele testified that, had she received training in what precursor misconduct to look for, she "absolutely" may have viewed Phillips' conduct differently.  Raffaele Dep. 286:23-287:16.

**G.  Plaintiff and defendants present expert testimony.**

Both plaintiff and defendants have presented expert testimony to support their arguments. Plaintiff's expert, Dr. Edward Dragan, "identified several standard-setting guidance and policy statements published by [the U.S. Department of Education Office of Civil Rights], which placed TESD on clear and ambiguous notice of its obligations regarding the protection of students from sexual harassment/abuse."  Pl.'s Brief 27.  Dr. Dragan opined that TESD failed to meet those obligations and "failed to create a safe environment consistent with industry standards and recommendations, in complete disregard and indifference to the health, safety, and well-being of its students."  Pl.'s Ex. LL ("Dragan Rep.") at 13.  Defendant's expert, Brett Sokolow, was of the opinion that TESD's policies and training are consistent with industry standards. Def.'s Ex. B ("Sokolow Rep.") at 70.

14

### H.  Procedural History

A.B. and C.B. filed the Complaint in this matter on behalf of D.B. on June 8, 2017. Plaintiff asserted a § 1983 claim against TESD and Principal Meisinger for failure to supervise, hire, and train its employees and a Title IX claim against TESD.  On August 14, 2017, defendants filed a Motion to Dismiss.  The Motion was granted in part and denied in part on June 11, 2018.  The Court denied the Motion as to plaintiff's § 1983 claim against TESD on a failure to train theory, plaintiff's § 1983 claim against Principal Meisinger, and plaintiff's Title IX claim against TESD.  The Court granted the Motion as to plaintiff's other theories of TESD's municipal liability under §1983.

On March 30, 2020, defendants filed this Motion for Summary Judgment (Document No. 43).  Plaintiff responded on April 20, 2020 (Document No. 45).  Defendants filed a Reply on May 13, 2020 (Document No. 52).  The Motion is thus ripe for decision.

## III.   LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient.

15

*Id* at 252.  In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment[ ] and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (internal citations omitted).  The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof.  *Celotex Corp.*, 477 U.S. at 322.

## IV.   DISCUSSION

Plaintiff asserts (1) a § 1983 claim against TESD alleging TESD was deliberately indifferent in failing to train employees to recognize and report signs of precursor misconduct; (2) a § 1983 claim for supervisory liability against Principal Meisinger under theories of (a) knowledge and acquiescence and (b) deliberate indifference in failure to train; and (3) a Title IX claim against TESD for sexual discrimination and harassment.  In their Motion for Summary Judgment on the § 1983 claims, defendants argue TESD staff and teachers were properly trained with respect to recognizing and reporting inappropriate behavior, there was no pattern of sexual misconduct within TESD, and no staff member or teacher was aware of any misconduct by Phillips.  Def.'s Opening Br. at 21-34.  On the Title IX claim, defendants argue no appropriate person had notice of Phillips' sexual misconduct, and defendants were not deliberately indifferent once there was actual notice of the misconduct.  Def.'s Opening Br. at 21-34.  The Court addresses each argument in turn.

### A.  Section 1983 Claim Against TESD

To succeed on a claim under § 1983, a plaintiff must allege that the defendant, acting under color of state law, deprived her of a right secured by the United States Constitution or federal law.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  Municipalities cannot be found vicariously liable under the doctrine of *respondeat superior* for claims that their

employees violated an individual's civil rights.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).  Rather, a plaintiff seeking to hold a municipality liable for a civil rights violation caused by a municipal employee must prove the existence of a custom or policy of the municipality pursuant to which the municipality's employee violated the plaintiff's civil rights.  *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *see also Bryan Cnty.*, 520 U.S. at 403; *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000).

A municipal "policy" may arise from the "decisions of [a municipality's] duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Bryan Cnty.*, 520 U.S. at 403-04.  A municipal "custom" is a practice that is "so widespread as to have the force of law," though the practice "has not been formally approved by an appropriate decisionmaker."  *Id.* at 404.  A municipality's failure to train its employees may be "properly thought of as a city 'policy or custom' that is actionable under § 1983" where the failure "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).

The United States Court of Appeals for the Third Circuit has identified "three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983."  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003).

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.  The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of

constitutional rights, that the policymaker can reasonably be said to
have been deliberately indifferent to the need.

*Id.* (internal quotations and citations omitted).

Plaintiff's failure to train claim falls within the third category of liability-creating

conduct.  To succeed on such a claim, plaintiff "must identify a failure to provide specific

training that has a causal nexus with their injuries and must demonstrate that the absence of that

specific training can reasonably be said to reflect a deliberate indifference to whether the alleged

constitutional deprivations occurred."  *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).

Where the risk to constitutional rights is not obvious from the nature of the activity, "deliberate

indifference on the part of city policymakers to the need for" training may be inferred from "a

pattern of constitutional violations."  *Sample v. Diecks*, 885 F.2d 1099, 1116 (3d Cir. 1989).  The

Supreme Court has held that a claim for failure to train turns on the deficiency of the "program"

as a whole and its application "over time to multiple employees."  *Bryan Cnty.*, 520 U.S. at 407.

Consequently, allegations that "a particular [employee] may be unsatisfactorily trained will not

alone suffice to fasten liability on the city, for the [employee's] shortcomings may have resulted

from factors other than a faulty training program."  *City of Canton*, 489 U.S. at 390–91.

Defendants do not dispute that TESD was acting under color of state law or that the

Fourteenth Amendment protected D.B.'s right to be free from sexual abuse by teachers.  The

disputed issues with respect to this claim are (1) whether TESD's claimed lack of training

amounted to deliberate indifference to plaintiff's constitutional rights and (2) whether the alleged

training deficiencies caused the constitutional violations.

### 1.  Deliberate Indifference

To establish deliberate indifference under plaintiff's failure to train theory, she must

prove that (1) TESD failed to act to appropriately train its employees; (2) the need for

appropriate training was "so obvious" in light of a pattern of similar constitutional violations; and (3) the inadequacy of the existing training was "so likely" to result in the violation of constitutional rights. *Natale*, 318 F.3d at 584. The Court concludes there are genuine disputes of material fact as to each of these elements.

In establishing inadequate training, the focus is on the "substance of the training, not the particular instructional format." *Connick v. Thompson*, 563 U.S. 51, 68 (2011). In this case, plaintiff alleges TESD failed to adequately train teachers and staff on Policy and Regulation 5461, which addressed precursor misconduct. In its Motion, TESD recognizes that it did not provide training on Policy and Regulation 5461 specifically but argues that preexisting policies covered the same conduct as Policy and Regulation 5461, prior training adequately addressed the necessary information relating to sexual assault, and teachers testified that they were adequately trained. Def.'s Opening Br. at 26, 29; Def.'s Reply Br. at 1-5. Both parties have presented expert opinions supporting their positions. Def.'s Reply Ex. B; Pl.'s Ex. LL. The Court concludes there is a genuine dispute over whether TESD's training was adequate.

As an initial matter, TESD argues its expert, Brett Sokolow, opined that TESD's policies, procedures, and training were "consistent with industry standards." Sokolow Rep. at 70. However, plaintiff's expert, Dr. Edward Dragan, reported that TESD "failed to create a safe environment consistent with industry standards." Dragan Rep. at 13. "Conflicting expert reports create a genuine issue of material fact which precludes summary judgment." *U.S. Airways v. Elliot Equipment Co.*, No. 06-1481, 2008 WL 4461849, at *2 (E.D. Pa. Sept. 29, 2008). This alone is sufficient to create a genuine dispute over whether TESD's precursor misconduct training was adequate. Nevertheless, the Court addresses TESD's other arguments.

Prior to February 2017, TESD did not have a written policy addressing precursor misconduct.  After Policy and Regulation 5461 were approved, TESD emailed teachers and staff links to access the new policy and regulation.  However, TESD did not instruct teachers and staff to read the policy and regulation, record which teachers and staff had opened the policy or regulation, or require teachers and staff to sign a certification that they read the policy and regulation.  Further, TESD did not have specific plans to provide training on the policy and regulation, beyond an intention to do so sometime in the future.  As there was no training on Policy and Regulation 5461, TESD must demonstrate that its prior training was adequate.

TESD argues its preexisting policies addressed precursor misconduct, demonstrating that the training was adequate.  However, Policy 4330, "Harassment by and of District Employees," and Policy 5420, "Harassment of Students by Non-Students," the preexisting policies relied upon by TESD, do not address precursor misconduct, by name or otherwise.  Contrary to defendants' assertion, Policy and Regulation 4330 do not define "sexual harassment" or provide guidance on recognizing sexual harassment.  Although Policy 5420 does define "sexual harassment," it also does not provide guidance on recognizing sexual harassment.  As such, a reasonable jury could find that TESD pre-existing policies did not adequately address precursor misconduct.

TESD next argues that Policy and Regulation 5461 served only to "add emphasis to training that had already been received by teachers and staff members."  Def.'s Opening Br. at 26.  Defendants state only that teachers "received child abuse training" without specifying a date or curriculum for the training.  Without this information, there remains a dispute over whether that earlier training addressed precursor misconduct.  *See Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136 (9th Cir. 2003) (finding a factual dispute where the harassment training is "limited" and does not specifically address the type of harassment reported by the

plaintiff); *Goodwin v. Pennridge Sch. Dist.*, 389 F. Supp. 3d 304, 322 (E.D. Pa. 2019) (a material factual dispute "as to the content of the training" is sufficient to deny summary judgment).

TESD further argues that its previous training was adequate because a number of teachers testified they received adequate training.  In contrast, plaintiff argues that at least two teachers testified TESD had not provided training on precursor misconduct and how to report it, and Dr. Dunleavy testified she did not know what precursor misconduct was.  *See* Raffaele Dep. 292:5-295:19; McGregor Dep. 132:2-133:3; Dunleavy Dep. 186:12-188:10.  In light of this conflicting testimony, the Court is unwilling to conclude TESD's prior training was adequate as a matter of law based on some of the teachers' own analysis of their training.  In light of the lack of specific training on Policy and Regulation 5461, the dispute over whether earlier training addressed precursor misconduct, and the disagreement between parties' experts, there is a genuine dispute over whether TESD's training was adequate.

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary" to demonstrate that the need for adequate training to address those constitutional violations was obvious.  *Connick*, 563 U.S. at 53.  In this case, because plaintiff alleges TESD's precursor misconduct training was inadequate, plaintiff must demonstrate TESD had a "pattern of similar constitutional violations" that involved precursor misconduct.  Plaintiff alleges this requirement is met through three factually-similar incidents at CHS, all of which involved precursor misconduct against students by staff members.  Pl.'s Br. at 35.  TESD denies that the earlier incidents create a "pattern" of sexual misconduct.  Def.'s Reply Br. at 10.  The Court concludes that, viewing the history of incidents in the light most favorable to plaintiff, there is a material dispute over the existence of a "pattern" of sexual abuse and harassment involving precursor misconduct at CHS.

As a preliminary matter, the "pattern" is limited to incidents involving similar constitutional violations.  Under the Fourteenth Amendment, individuals have a right to bodily integrity.  *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).  This protects a student's right to be free from sexual abuse and harassment by teachers at a public school.  *B.W. v. Career Technology Center of Lackawanna County*, 422 F. Supp. 3d 859, 888-89 (M.D. Pa. 2019); *Doe v. Boyertown Area Sch. Dist.*, 10 F. Supp. 3d 637, 650 (E.D. Pa. 2014).  The CHS incidents involving Genovese and Towers involved violations of students' constitutional rights because the student victims were sexually assaulted.  *See Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989) ("[A] teacher's sexual molestation of a student is an intrusion of the schoolchild's bodily integrity.").  Plaintiff also claims Goodman's conduct rose to the level of sexual harassment, specifically citing sexual, sexist, and otherwise inappropriate comments that made female students uncomfortable.  In contrast, defendants argue Goodman was disciplined for sending text messages to a student, which were not sexual in nature.  Pl.'s Br. at 4-6; Def.'s Br. at 9.  However, the record shows that in addition to facing discipline for sending text messages to a student, Goodman was disciplined for making sexual and sexist comments to students.  Pl.'s Ex. E.  Viewing the evidence in the light most favorable to the plaintiff, she has alleged sufficient facts that a reasonable juror could find Goodman engaged in sexual harassment at CHS and, therefore, that the Goodman incident—together with Genovese and Tower's misconduct—was part of the alleged "pattern" at CHS.

In *Farrell v. Northampton County*, the Court held that a reasonable factfinder could rely on two previous incidents that occurred in the three years prior to the incident at issue in the case to find that government officials were aware of a pattern of constitutional violations.  No. 11-cv-3665, 2015 WL 4611298, at *6-7 (E.D. Pa. Aug. 3, 2015).  The Court specifically emphasized

the similarities in factual allegations between all three of the incidents. *Id.* at *7.  In this case, plaintiff alleges that, in the twelve years prior to this incident, three other CHS teachers—Towers, Genovese, and Goodman—were accused of sexual misconduct or harassment with students. Towers and Genovese were ultimately arrested for their misconduct.  The most recent incident, that involving Towers, occurred only one year before Phillips was arrested.  Plaintiff argues that each of these incidents involved precursor misconduct similar to Phillips's behavior, such as taking the victims off campus and communicating via electronic messages.  In light of these facts, a reasonable jury could find that a pattern of abuse existed at CHS, putting TESD on notice that its training procedures were inadequate.  *See also J.K.J. v. Polk County*, 15-cv-428-wmc, 2017 WL 28093, at *11  (W.D. Wisc. Jan. 3, 2017) (finding that two incidents in twelve years was sufficient to put the agent on notice as to the need for different training).

Plaintiff claims that, given this pattern of sexual misconduct, CHS was on notice that other incidents of sexual abuse of a student by a teacher were a "highly predictable consequence" of its allegedly inadequate training. Pl.'s Br. at 44.  TESD denies such a pattern existed and emphasizes that it developed Policy 5461 following the Towers incident.  Def.'s Reply Br. at 10.

TESD states that Policies 4330 and 5420, which it argues address sexual harassment, "were in place well before the alleged actions" of Genovese, Goodman, and Towers.  Def.'s Opening Br. at 24.  However, a reasonable jury could find that, in light of the previous incidents of sexual harassment at CHS that occurred under the same policies, the pre-existing policies and training were inadequate such that other incidents were likely to occur.  *See Thomas v. Cumberland Cnty.*, 749 F.3d 217, 225 (3d Cir. 2014) (concluding that the history of fights in a prison could lead a reasonable jury to find it was likely that an officer who lacked appropriate training would violate an inmate's rights).  Further, TESD argues its development of Policy 5461

is evidence that it is "extremely active in constantly attempting to update its policies." Def.'s

Opening Br. at 24.  But a reasonable jury could find that TESD's adoption of the policy

following the Towers incident is evidence that TESD was aware in 2016 that its policies and

training did not adequately address precursor misconduct but chose not to provide training,

making it likely that other incidents would occur.  Thus, there is a genuine dispute as to whether

the alleged inadequacy of TESD's training was "so likely" to result in violations of students'

constitutional rights.  As such, there are genuine disputes over whether TESD's training was

adequate to protect its students, whether a pattern of sexual abuse existed at CHS, and whether

the inadequacy was likely to result in other similar incidents, creating a dispute over whether

TESD acted with deliberate indifference in failing to train its employees.

2.  <em>Causation</em>

To succeed on her failure to train claim, plaintiff must also show that the alleged

inadequate training "has a causal nexus" to her injuries.  *Reitz v. Cnty. of Bucks*, 125 F.3d 139,

145 (3d Cir. 1997).  "Liability cannot rest only on a showing that the employees 'could have

been better trained or that additional training was available that would have reduced the overall

risk of constitutional injury.'"  *Thomas*, 749 F.3d at 226.  Rather, the plaintiff must demonstrate

there is "some specific training that would have prevented the deprivation of plaintiff's

constitutional rights."  *Lockhart v. Willingboro High School*, 170 F. Supp. 3d 722, 733 (D.N.J.

2015).  Plaintiff may show that the deliberate indifference was the "proximate cause" of her

injuries by demonstrating "occurrence of the specific violation was made reasonably probable by

permitted continuation of the custom."  *Watson v. Abington Twp.*, 478 F.3d 144, 155-56 (3d Cir.

2007).

TESD argues no TESD employees were aware of Phillips's sexual misconduct, and so additional training would not have affected their decision as to whether to report Phillips.  Def,'s Opening Br. at 30-31.  In response, plaintiff points out that there are disputes over the material facts of which teachers were aware of which incidents of Phillips's misconduct.  Further, plaintiff argues that the allegedly inadequate training allowed Phillips's conduct to go unreported because, had TESD employees received adequate training on precursor misconduct, they would have recognized Phillips behavior as precursor misconduct and known to report it.  The Court agrees with plaintiff that there are material disputes over which teachers were aware of Phillips's misconduct and whether adequate training would have led a teacher to recognize and report Phillips's misconduct.

There is conflicting testimony as to which teachers were aware of Phillips's misconduct:

- Plaintiff testified Ms. Raffaele knew she left campus with Phillips during the lunch period.  Ms. Raffaele denies such knowledge but admits that she attended three meals off-campus with Phillips and D.B. at the end of the school day.  Plaintiff also testified Ms. Raffaele saw Phillips kick her, and she repeatedly told Ms. Raffaele that she "hated" Phillips.  Ms. Raffaele stated she had a conversation with Mr. Azar about the close relationship between Phillips and D.B.

- Plaintiff testified Mr. Azar knew she left campus for lunch.  Mr. Azar denies such knowledge.  Plaintiff also testified Mr. Azar saw Phillips kick her.  Ms. Raffaele stated she and Mr. Azar discussed the close relationship between Phillips and D.B.  Another student reported that he told Mr. Azar D.B. was cutting class to spend time in the TV studio.

- Plaintiff testified she twice "yelled" in front of Mr. Shore that Phillips was "stalking" her.  D.B. Dep. 19:9-15.

- Ms. Fillippo twice provided Phillips with a copy of D.B.'s schedule upon his request.  The second time, Phillips stated D.B. "ke[pt] deleting it from [his] desktop," so he would "put it in [his] password protected folder."  Bankert Dep. Ex. 6.

- Ms. Gregory testified she saw D.B. in the TV studio during the lunch period and told Phillips it was a violation of school policy for students to eat in the TV studio.

- Ms. McGregor testified there was a "lust triangle" between Phillips, Ms. Raffaele, and D.B., and she noticed several "red flags." Ms. McGregor heard a student refer to another student as "Art's girlfriend." D.B. testified that Ms. McGregor knew Phillips was taking D.B. off campus for lunch.

- D.B. testified that Mr. Austin walked in on an incident that involved Phillips holding her down. This account is supported by an email Phillips wrote to himself, in which he stated Mr. Austin walked in on the incident and wanted to talk to him about it. Mr. Austin denies the incident occurred.

- Dr. Dunleavy testified that Assistant Principal Bankert referred D.B. to her because of the way she presented in his office. Dr. Dunleavy did not call D.B. to her office to meet with D.B. until four days later. They met for up to two hours, but Dr. Dunleavy did not follow up with Assistant Principal Bankert or D.B.

- C.B. testified that Dr. Dunleavy told her Assistant Principal DiLella saw Phillips pull D.B. into an empty classroom and told Assistant Principal Bankert it made the hair on the back of his neck stand up. D.B. testified that Dr. Dunleavy told her this as well. Dr. Dunleavy, Assistant Principal DiLella, and Assistant Principal Bankert all deny that this incident occurred.

- Ms. Talian testified that she noticed a change in D.B.'s affect, including behavioral concerns and missed classes, in the spring. Phillips signed several hall passes allowing D.B. to miss or be late to her class. D.B. testified that she told Ms. Talian "something very terrible is happening to [her]." D.B. Dep. 75:8-9. Ms. Talian referred D.B. to her guidance counselor but did not follow up with D.B. or report the change.

- Assistant Principal Bankert testified that he was "worried" about D.B. after she received three disciplinary referrals in two-and-a-half weeks. Bankert Dep. 50:15-20. D.B. testified she told him "something terrible" was happening to her. D.B. Dep. 77:24-78:3. Although Assistant Principal Bankert referred D.B. to Dr. Dunleavy, there is a dispute as to whether he ever followed up with Dr. Dunleavy. He did not follow up with D.B.

- D.B. testified that security guard Katie Galie and Ms. Argonish were both aware that Phillips took her off campus.[12]

Resolving the inconsistencies in this testimony will necessarily require credibility

determinations that are inappropriate at the summary judgment stage. *See Howard Blalock Elec.*

---

[12] Plaintiff also alleges that Ms. Wilson observed precursor misconduct between Phillips and D.B. Pl.'s Br. at 19. However, the only allegation plaintiff makes regarding Ms. Wilson is that Ms. Wilson later told Mr. Austin that she wished she reported Phillips's behavior that made her uncomfortable, such as Phillips calling her "sweetie." Pl's Br. at 40. Plaintiff does not allege any facts suggesting that Ms. Wilson was aware of Phillips's behavior towards D.B.

*Serv. Inc.*, 742 F. Supp. 2d 681, 707 (W.D. Pa. 2010) ("A trier of fact would have to discredit

[defendant's] testimony in order to credit [plaintiff's] testimony. This Court cannot make

credibility-related findings when ruling on a motion for summary judgment.").

Plaintiff argues that TESD's failure to provide training on precursor misconduct created a

foreseeable increase in the likelihood of sexual abuse of a student by a teacher.  Plaintiff further

argues that, had TESD adequately trained its employees, the teachers and staff who knew of

Phillips's misconduct would have reported it to CHS or TESD administration.  Pl.'s Br. at 39.

Plaintiff specifically cites Ms. Raffaele's testimony on this issue:

> Q. Notwithstanding your fondness at the time for Mr. Phillips, and
> notwithstanding the fact that your testimony is that you never saw
> him do anything sexually to her, if the specifics of precursor
> misconduct were provided in training to you and emphasized to you
> as things to look for, isn't it fair to conclude, ma'am, that you may
> have looked at his conduct differently?
> A. Yes.
> Q. And you can say that right into the camera.
> A. Yes.
> Q. Absolutely. Isn't that true?
> A. Absolutely. Yes.
> Q. And this whole thing could have been avoided.
> A. Yes.

Raffaele Dep. 286:17-287:14.

Ms. McGregor testified that, although she noticed several "red flags" in the interactions

between Phillips and D.B., she did not receive training on what to do upon seeing inappropriate

conduct between a teacher and a student.  McGregor Dep. 48:9-50:8, 132:2-133:3.  Although she

heard a student refer to another student[13] as "Art's girlfriend," she testified that she did not

"recall receiving any training that would have led [her] to believe that hearing somebody refer to

another student as the girlfriend of a staff member is something that should be reported to the

---

[13] She did not identify the "other student" as D.B.  McGregor Dep. 115:6-18.

School District."  McGregor Dep. 116:3-12.  Ultimately, she did not report the comment because she "didn't take it seriously" and had not received training that the comment should be reported. McGregor Dep. 116:1-2.

TESD does not respond to plaintiff's argument that adequate training would have led a teacher to report Phillips's misconduct.  Rather, TESD argues the training was adequate, and so teachers would have reported Phillips's misconduct had they known about it.  On this issue, TESD points out that Ms. Raffaele was unaware of Phillips's misconduct when she knowingly broke TESD policy by taking plaintiff off campus for meals, and her employment was terminated for breaking the policy.  Def.'s Opening Br. at 31-32.  However, TESD does not respond to Ms. Raffaele's testimony that, had she received adequate training on precursor misconduct, she might have recognized and reported Phillips's behavior or Ms. McGregor's testimony that she was not trained to report the "red flags" she noticed.

In this case, a reasonable jury could conclude the evidence establishes a causal nexus. There is a disputed issue of material fact as to whether adequate training regarding precursor misconduct would have caused one or more of the teachers to either (1) report the misconduct they observed, or (2) recognize Phillips's behavior as precursor misconduct and report it as such. *See Wichterman v. City of Philadelphia*, 16-cv-5796, 2019 WL 3216609, at *9 (Jul. 17, 2019 E.D. Pa.) (finding a causal nexus between the defendant's failure to train officers in recognizing and responding to an overdose and the plaintiff's overdose because appropriate training would have allowed the officer to recognize the signs of an overdose in plaintiff and seek help). Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that TESD's allegedly inadequate training was the proximate cause of her injuries.

28

**B.  Section 1983 Against Principal Amy A. Meisinger**

As with plaintiff's claim against TESD, to succeed on her § 1983 against Principal

Meisinger in her individual capacity, plaintiff must allege that the defendant, acting under color

of state law, deprived her of a right secured by the United States Constitution or federal law. *Am.*

*Mfrs. Mut. Ins. Co.*, 526 U.S. at 49–50.  The Third Circuit has identified two ways in which a

supervisor may be liable under § 1983 for the conduct of a subordinate.  First, "a supervisor may

be personally liable under § 1983 if he or she participated in violating the plaintiff's rights,

directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in

the subordinate's misconduct.  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d

572, 586 (3d Cir. 2004).  Second, "[i]ndividual defendants who are policymakers may be liable

under § 1983 if it is shown that such defendants, 'with deliberate indifference to the

consequences, established and maintained a policy, practice or custom which directly caused

[the] constitutional harm.'"  *Id.* at 586 (quoting *Stoneking*, 882 F.2d at 725).  Plaintiff argues

Principal Meisinger is liable under both theories of supervisory liability.  The Court addresses

each in turn.

*1.  Knowledge and Acquiescence*

To succeed on a "knowledge and acquiescence" theory of supervisory liability, plaintiff

must demonstrate that Principal Meisinger had contemporaneous knowledge of the constitutional

deprivation and acquiesced to it.  *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 706 (E.D.

Pa. 2011).  However, plaintiff does not allege that Principal Meisinger had actual knowledge of

Phillips's misconduct.  Rather, plaintiff argues the other incidents of sexual abuse and

harassment put Principal Meisinger on notice that CHS's training was inadequate such that it

created an "unreasonable risk to students' constitutional right to be safe at school" and that she

was "deliberately indifferent" in failing to address the deficiencies.[14]  Pl.'s Br. at 51.  The Court

concludes plaintiff's evidence is insufficient as a matter of law to establish that Principal

Meisinger had knowledge of and acquiesced in Phillips's sexual misconduct.  Although Principal

Meisinger was aware of the previous incidents at CHS, there is no evidence that she had

contemporaneous knowledge of Phillips's misconduct.  Without such evidence, plaintiff cannot

prove Principal Meisinger acquiesced in Phillips's misconduct.  For that reason, defendant's

Motion for Summary Judgment is granted as to plaintiff's § 1983 supervisory liability claim

against Principal Meisinger based on the theory of knowledge and acquiescence.

### 2.   *Deliberate Indifference*

Only a defendant with policymaking authority can be held individually liable under

§ 1983 on a supervisory liability theory for deliberate indifference.  *A.M.*, 372 F.3d at 586.  Once

policymaking authority is established, "the standard for personal liability under section 1983 is

the same as that for municipal liability."  *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d

Cir. 1999).  That is, the plaintiff must establish (1) defendant failed to act to appropriately train

its employees; (2) the need for appropriate training was "so obvious" in light of a pattern of

similar constitutional violations; and (3) the inadequacy of the existing training was "so likely"

to result in the violation of constitutional rights.  *Natale*, 318 F.3d at 584. Unlike establishing

---

[14] Plaintiff also argues the two incidents of student-on-student sexual harassment, discussed *supra*, put Dr. Meisinger on notice of TESD's inadequate training.  However, plaintiff's argument regarding inadequate training relates to TESD's failure to train teachers and staff on precursor misconduct.  By definition, precursor misconduct involves "the targeting of a student *by an adult*." Def.'s Ex. H (emphasis added).  Therefore, student-on-student incidents could not have contributed to Dr. Meisinger's knowledge that TESD's precursor misconduct training was inadequate.

supervisory liability under the knowledge and acquiescence theory, actual knowledge of the misconduct is not required.

Plaintiff argues that Principal Meisinger has held the highest supervisory position at CHS since 2009 and that it was within her supervisory authority to train the CHS staff. Principal Meisinger does not dispute that she is a policymaker. *See* Def.'s Opening Br. at 36 ("Conestoga High School, *as led by Principal*, Dr. Meisinger, actively trains its staff…") (emphasis added). Thus, viewing the evidence in the light most favorable to plaintiff, she was a policymaker for purposes of supervisory liability.

For the foregoing reasons, defendant's motion for summary judgment is denied as to plaintiff's § 1983 supervisory liability claim against Principal Meisinger based on plaintiff's theory of deliberate indifference in failure to train. *See A.M.*, 372 F.3d at 586 (denying motion for summary judgment as to individual defendants who were policymakers because questions of material fact precluded summary judgment as to municipal liability).

Principal Meisinger seeks to distinguish the claim against her from that against TESD because she did not work for TESD at the time of the Genovese incident and was not principal of CHS at the time of the Goodman incident. The Court finds this argument unconvincing. Principal Meisinger testified that she was informed of the Genovese incident when she was hired by TESD later that same year. Meisinger Dep. 155:7-156:11. Principal Meisinger was an assistant principal at CHS during the Goodman incident and participated in the investigation. Meisinger Dep. 159:5-23. To the extent that these incidents constituted a pattern of constitutional violations, a reasonable jury could find that Principal Meisinger was, or reasonably should have been, on notice of the pattern and aware that existing policies were inadequate such that other similar incidents were likely to occur. As such, defendant's Motion for Summary

Judgment is denied as to plaintiff's § 1983 supervisory liability claim against Principal Meisinger based on a theory of deliberate indifference in failing to train.

### C.  Title IX

Title IX provides, in relevant part, "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 2681(a).  To succeed on a sexual harassment claim under Title IX, a plaintiff must prove: (1) she was subject to *quid pro quo* sexual harassment or a sexually hostile educational environment; (2) an "appropriate person" had "actual knowledge" of the harassment; and (3) the school responded with "deliberate indifference."  *Bennett v. Penn. Hosp. Sch. Of Nurse Anesthesia*, No. 01-cv-4098, 2002 WL 3234192, at \*3 (E.D. Pa. Oct. 29, 2002).  This "express remedial scheme is predicated upon notice to an appropriate person and an opportunity to rectify any violation." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Plaintiff argues three appropriate persons—Assistant Principal DiLella, Assistant Principal Bankert, and Mr. Austin—had actual knowledge of Phillips's misconduct.  Plaintiff further argues TESD responded with deliberate indifference because (1) none of the three appropriate persons reported or investigated the misconduct; and (2) TESD failed to adequately implement Policy 5461.

TESD does not dispute that it receives federal funding, that the sexual assault of D.B. created a sexually hostile educational environment, or that D.B. was deprived of access to educational opportunities or benefits when she transferred out of TESD.  TESD argues, however, that no appropriate person had actual knowledge of the harassment and that TESD's response, once it learned of the harassment, did not amount to deliberate indifference.

The Court addresses each argument in turn.

### 1. *Actual Knowledge by an Appropriate Person*

A Title IX claim for sexual harassment requires "actual knowledge" by an "appropriate person." *Gebser*, 524 U.S. at 290. An appropriate person is "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Id.* Whether an official is an appropriate person is a fact-intensive inquiry based on the official's job responsibilities. *See Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 170–173 (3d Cir. 2002). Plaintiff alleges Assistant Principal DiLella, Assistant Principal Bankert, and Mr. Austin, as Department Chair for Technology and Engineering, are appropriate persons. TESD does not dispute that these three officials are "appropriate persons" but argues that they did not have "actual knowledge" of misconduct. Def.'s Reply Br. at 11.

"Precedent is imprecise about exactly how *much* an appropriate person must know in order to satisfy the actual knowledge prong of the test." *Does v. Southeast Delco Sch. Dist.*, 272 F. Supp. 3d 656, 688 (E.D. Pa. 2017) (emphasis in original). "A plaintiff must prove an appropriate person knew of acts sufficiently indicating a danger of future abuse." *Id.* at 689; s*ee also Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005) ("An educational institution has actual knowledge if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger."). This standard imposes liability "where school officials suspect, but cannot be sure of, abusive conduct." *Does*, 272 F. Supp. 3d at 689. However, constructive knowledge is not sufficient, and "actual knowledge cannot be based upon a mere possibility" that a student is in danger. *Id.* When the evidence suggests that the official had some knowledge of misconduct, whether the known information is sufficient to meet the bar

of actual knowledge "is a fact-based inquiry." *K.E. v. Dover Area Sch. Dist.*, No. 1:15-cv-1634, 2016 WL 2897614, at *9 (M.D. Pa. May 18, 2016).

Plaintiff alleges that Assistant Principal DiLella had actual knowledge of Phillips's misconduct because he witnessed Phillips pull D.B. into a classroom and that Assistant Principal Bankert had actual knowledge of the misconduct because Assistant Principal DiLella told him about the incident. Defendants argue Assistant Principal DiLella, Assistant Principal Bankert, and Dr. Dunleavy testified the incident did not occur. Def.'s Br. at 17-20. The questions of whether the incident occurred and whether it provided Assistant Principals DiLella and Bankert with notice that D.B. was in "danger of future abuse" are "fact-based inquir[ies]" that must be resolved by the jury. *Does*, 272 F. Supp. 3d at 688; *K.E*, 2016 WL 2897614, at *9.

Plaintiff also alleges that Mr. Austin had actual knowledge of Phillips's misconduct because he witnessed Phillips interacting inappropriately with the plaintiff. Plaintiff specifically cites the email Phillips sent himself about the incident as well as D.B.'s testimony that she remembered the incident and that Phillips told her Mr. Austin was "mad" when he talked to him about it. D.B. Dep. 140:16-142:16. Defendants argue Mr. Austin testified the incident did not occur. Def.'s Reply Br. at 11. As with Assistant Principal DiLella and Assistant Principal Bankert, the questions of whether the incident occurred and whether it provided Mr. Austin with notice that D.B. was in "danger of future abuse" are "fact-based inquir[ies]" that must be resolved by the jury. *Does*, 272 F. Supp. 3d at 688; *K.E*, 2016 WL 2897614, at *9.

The Court, therefore, concludes there is a genuine issue of material fact on the question whether at least one appropriate person had notice that D.B. was in "sufficiently substantial danger" of future abuse from Phillips. *Bostic*, 418 F.3d at 361.

34

### 2.   *Deliberate Indifference*

A school's response to actual knowledge of sexual harassment of a student is deliberately indifferent where there was "an official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290.  That decision must be "clearly unreasonable in light of the known circumstances."  *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 648 (1999).  Plaintiff alleges TESD was deliberately indifferent in two ways: (1) its failure to perform an investigation into Phillips's abuse of D.B.; and (2) the manner in which Policy 5461 was enacted.

Plaintiff first alleges TESD was deliberately indifferent by failing to investigate the misconduct between Phillips and D.B.[15]  Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that as many as three appropriate persons had actual knowledge of Phillips's misconduct prior to April 18, 2017, when TESD discovered Phillips's misconduct.[16] *See* Section II. C. 1., *supra*.  Plaintiff alleges none of the three investigated or reported the misconduct.  A reasonable jury could find that Assistant Principal DiLella and Assistant Principal Bankert's failure to act following the classroom incident and Mr. Austin's failure to act after witnessing Phillips touching D.B. were "clearly unreasonable in light of the known circumstances" and, therefore, constituted deliberate indifference.  *Davis*, 526 U.S. at 648.[17]  *See Roussaw v. Mastery Charter High Sch.*, No. 19-cv-1458, 2020 WL 2615621, at *6-7

---

[15] Plaintiff alleges TESD was incorrect in its belief that it did not have a duty to independently investigate claims of sexual assault while a police investigation was ongoing.  However, the testimony plaintiff cites relates to TESD's investigation of the Towers incident in the prior school year.  Plaintiff does not allege TESD failed to investigate Phillips's sexual misconduct after April 18, 2017.

[16] In response, TESD argues only that it reacted appropriately after Phillips's misconduct was exposed on April 18, 2017.  However, plaintiff's argument is based on TESD's alleged deliberate indifference before Phillips's misconduct was exposed.

[17] Although Assistant Principal Bankert referred D.B. to Dr. Dunleavy on April 3, 2017 after she told him "something terrible" was happening to her, it is not clear from the record when Assistant Principal DiLella witnessed the classroom incident or when he told Assistant Principal Bankert of it.  D.B. Dep. 77:24-78:3.  As such, a reasonable jury could find that Assistant Principal Bankert was deliberately indifferent in failing to report or investigate in the time between learning of the incident and referring D.B. to Dr. Dunleavy.

(E.D. Pa., May 22, 2020) (concluding that a period of thirteen days in which the school "took no action to address the sexual assault" was "unreasonable under the circumstances"); *Chancellor v. Pottsgrove Sch. Dist.*, 5001 F. Supp. 2d 695, 709 (E.D. Pa. 2007) (denying summary judgment because a reasonable juror could find a school official's failure to report a teacher's sexual relationship with a student was deliberately indifferent).

Plaintiff also argues summary judgment should not be granted with respect to the Title IX claim on the ground that TESD was deliberately indifferent in its enactment of Policy 5461. Specifically, plaintiff argues TESD: (1) delayed the enactment of Policy 5461; (2) failed to ensure its employees reviewed Policy 5461; and (3) did not provide training on Policy 5461. Under Title IX, deliberate indifference is "an official decision . . . not to remedy the violation," *Gebser*, 524 U.S. at 290, that is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Plaintiff's argument in this case is unusual in that the appropriate persons with knowledge of the misconduct—Assistant Principal DiLella, Assistant Principal Bankert, and Mr. Austin—are not the persons responsible for issuance or implementation of Policy 5461. Plaintiff has cited no authority, nor has the Court found any authority, supporting plaintiff's proposition that decisions made by those without actual knowledge of misconduct can constitute deliberate indifference under Title IX where different "appropriate persons" have such knowledge. Under these circumstances, the Court does not decide this aspect of plaintiff's Title IX claim on the present state of the record. Should plaintiff elect to proceed on this part of her Title IX claim at trial, additional briefing and argument will be required.

The Court concludes that TESD's liability under Title IX under plaintiff's first theory—Assistant Principal DiLella, Assistant Principal Bankert, and Mr. Austin acted with deliberate indifference in failing to investigate or report Phillips's misconduct which they witnessed—must

be resolved by a jury.  The Court thus denies that part of defendant's Motion for Summary Judgment that seeks summary judgment on plaintiff's Title IX claim.

## V.      CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment is denied in part and granted in part. That part of defendant's Motion that seeks summary judgment on plaintiff's § 1983 municipal liability claim against TESD for failure to train is denied.  That part of defendant's Motion that seeks summary judgment on plaintiff's § 1983 supervisory liability claim against Principal Meisinger under a theory of knowledge and acquiescence is granted. That part of defendant's Motion that seeks summary judgment on plaintiff's § 1983 supervisory liability claim against Principal Meisinger under a theory of deliberate indifference by failing to train is denied.  That part of defendant's Motion that seeks summary judgment on plaintiff's Title IX claim is denied.  An appropriate order follows.