**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | | |
|---|---|---|---|
| D.B., | | : | |
| | Plaintiff | : | No. 2:17-cv-02581-JD |
| v. | | : | |
| | | : | |
| TREDYFFRIN/EASTTOWN | | : | |
| SCHOOL DISTRICT and | | : | |
| AMY A. MEISINGER, | | : | |
| | Defendants. | : | |

_____

### TRIAL BRIEF OF TREDYFFRIN/EASTTOWN SCHOOL DISTRICT AND AMY A. MEISINGER

Pursuant to this Court's Order of November 20, 2020 [ECF No. 60] and Local Rule 16, Tredyffrin/Easttown School District ("School District") and Dr. Amy A. Meisinger ("Dr. Meisinger") (collectively, "TESD"), hereby file and serve this Trial Memorandum.

### I.    AGREEMENT/DISAGREEMENT WITH PLAINTIFFS' STATEMENT OF THE ISSUES

Plaintiff and Defendants have submitted Joint Stipulations of Facts. Other than the Stipulated Facts, Defendants disagree with all of Plaintiff's stated issues. Defendants refer to their Motion for Summary Judgment, Pretrial Memorandum, and Motions *in Limine*, filed with this Honorable Court.

### II.    ADDITIONAL ISSUES TO BE TRIED

None to the knowledge of Defendants.

### III.    A.    FACTS TO BE PROVEN AT TRIAL

A complete recitation of the facts of this case are set forth in the Pretrial Memorandum filed by Defendants on February 12, 2021. A summary of the facts to be established at trial is set forth below.

No employee or staff member had any knowledge, or indeed any reason to suspect, that Arthur Phillips was engaged in a relationship with the Plaintiff. Through the testimony of the employees, it is clear that not a single employee of the District even observed Plaintiff and Phillips alone together. To the contrary, while there has been testimony that Plaintiff was often observed in the TV Studio, the testimony and evidence, including the testimony of the Plaintiff herself, supports that she spent time in the TV Studio to be with her friends, including E.H. and J.L. As established by the testimony of multiple individuals employed by the District, there were always multiple people in the TV Studio when Plaintiff was observed to be in the TV Studio. To this end, the conduct of Arthur Phillips, and his harassment of the Plaintiff, was purposefully done in secret so as to avoid detection.

Defendants will establish that Plaintiff herself did not tell any teacher, administrator, counselor, or indeed, even her parents, of the relationship with or conduct of Arthur Phillips,.

Defendants will also establish that Plaintiff's parents were in a position in December, 2016, and January, 2017, prior to the relationship occurring, to report inappropriate behavior of Mr. Phillips to the administration based on what their daughter told them. Specifically, according to Plaintiff's mother's testimony, in December, Plaintiff requested to purchase a belt for a male teacher. In January 2017, Plaintiff told her mother and father that a male teacher had allowed her to drive his car in the school parking lot. Also in January 2017, Plaintiff's mother saw texts which she believed to be from a teacher on her daughter's phone. Plaintiff's parents did not attempt to communicate any of these concerns to administration until April 2017. In that, according to Plaintiff's testimony, the first kiss was on January 29, 2017, and the first intercourse occurred in March 2017, had Plaintiff's parents communicated this information to administration in January 2017 when they were aware of it, rather than waiting until April 2017, the District

would have immediately engaged in an investigation and discipline of Arthur Phillips prior to any sexual misconduct having occurred.

Defendants will also establish that the employees of the District had more than adequate training and understanding of not only the policies of the District, but also as to the signs of inappropriate conduct of employees of the District and signs of sexual abuse. The employees who worked within the District all testified that they understood signs of precursor misconduct or grooming, whether or not they understood to use that particular terminology.

Defendants will also establish that their policies and procedures were above the required standards. Prior to the events at issue in this case, Defendants had in place stringent policies prohibiting electronic communications with students, prohibiting any sexual harassment, and reporting sexual harassment. As testified to by Dr. Gusick and Mr. Cataldi, the District is constantly and consistently reviewing its policies and regulations to ensure that their students safety is of the utmost priority. It will be established that the policies, procedures and training were above standards prior to and at the time of the misconduct of Arthur Phillips.

Defendants will establish that no appropriate person as defined by law had notice of any inappropriate behavior on the part of Arthur Phillips prior to April 18, 2017, when Plaintiff's parents came into Conestoga High School to speak with Dr. DiLella.

It will be established through the testimony and evidence in this matter that there is no custom or practice within the District that permits, either tacitly or explicitly, inappropriate conduct by either students or staff. To the contrary, the policies and training of the District consistently emphasize the safety and well-being of its students. The District acts promptly when any claims, or even rumors, of potential misconduct or any time are suspected, and appropriately

investigates and disciplines anyone suspected of any conduct that is deemed either inappropriate

or in violation of any policy of the District.

### B.      WITNESSES TO TESTIFY CONTRARY TO PLAINTIFFS' CLAIMS

The following witnesses will offer testimony contrary to Plaintiff's claims:

1.      Amy A. Meisinger, Ph.D.
        c/o Connor Weber and Oberlies
        171 W. Lancaster Ave.
        Paoli, PA 19301

2.      Richard Gusick, Ph.D.
        c/o Connor Weber and Oberlies
        171 W. Lancaster Ave.
        Paoli, PA 19301

3.      Mark Cataldi
        c/o Connor Weber and Oberlies
        171 W. Lancaster Ave.
        Paoli, PA 19301

4.      Anthony DiLella, Ph.D.
        c/o Connor Weber and Oberlies
        171 W. Lancaster Ave.
        Paoli, PA 19301

5.      Jamie Bankert
        c/o Connor Weber and Oberlies
        171 W. Lancaster Ave.
        Paoli, PA 19301

6.      Christine Dunleavy
        c/o Connor Weber and Oberlies
        171 W. Lancaster Ave.
        Paoli, PA 19301

7.      Noah Austin
        c/o Connor Weber and Oberlies
        171 W. Lancaster Ave.
        Paoli, PA 19301

8.      Alex Azar
        c/o Connor Weber and Oberlies
        171 W. Lancaster Ave.

Paoli, PA 19301

9.    Mary (Emmy) Talian
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

10.   Susan Gregory
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

11.   Joanne Wagner
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

12.   Jane McGregor
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

13.   Piera Raffaele
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

14.   Seth Shore
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

15.   Brett Sokolow, J.D. (Defense Liability expert)
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

16.   Kenneth Trump (Defense Liability expert)
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

17.   Peter Badgio, Ph.D. (Defense Damages expert)
c/o Connor Weber and Oberlies
171 W. Lancaster Ave.
Paoli, PA 19301

18.   Robin Altman, M.D. (Defense Damages expert)

      c/o Connor Weber and Oberlies
      171 W. Lancaster Ave.
      Paoli, PA 19301

19.   Chad Staller (Defense Damages expert)
      c/o Connor Weber and Oberlies
      171 W. Lancaster Ave.
      Paoli, PA 19301

20.   E.H. (Student at CHS)

21.   J.L. (Student at CHS)

22.   L.C. (Student at CHS)

In addition, a portion of the proposed testimony of Plaintiff's mother, C.B, father, A.B., and that of Plaintiff herself refutes Plaintiff's claims.

Defendants reserve their right to call any witnesses designated by Plaintiff.

### C.   DOCUMENTARY EVIDENCE SUPPORTING FACTS

A complete list of the exhibits Defendants intend to introduce is attached hereto. It is submitted that each exhibit in some manner supports the factual position of Defendants.

Defendants reserve their right to use any documents designated by Plaintiff.

### IV.   MEMORANDA AND LEGAL AUTHORITY IN SUPPORT OF EVIDENTIARY QUESTIONS AND OTHER LEGAL ISSUES

***Evidentiary Issues***

In the interests of brevity, Defendants will not set forth at length the legal support cited for the positions set forth in the Motions *in Limine* filed with the court. The following Motions *in Limine* are pending before this Honorable Court:

- Motion *in Limine* to Preclude Proposed Hearsay Testimony

- Motion *in Limine* to Preclude Introduction of or Testimony Regarding Notes Pertaining to Interviews of Students and Employees as Hearsay

- Motion *in Limine* to Preclude Plaintiff's Expert, Edward Dragan, Ed.D., from Offering Inappropriate Legal Conclusions

- Motion *in Limine* to Preclude Proposed Testimony of Plaintiff's expert, Edward Dragan, Ed.D. re: mischaracterizations of testimony

- Motion *in Limine* to Preclude Introduction of or Reference to Materials from Computer of Arthur Phillips

- Motion *in Limine* to Preclude any Testimony, Evidence, or Reference to Jonathan Goodman or Allegations Pertaining Thereto

- Motion *in Limine* to Preclude any Testimony, Evidence, or Reference to Christopher Genovese or Allegations Pertaining Thereto

- Motion *in Limine* to Preclude any Testimony, Evidence, or Reference to Alleged Locker Room Incident or Photographic Exchange of Middle School Students

- Motion *in Limine* to Preclude Testimony, Evidence, or Reference to Hall Passes or Alleged Tardiness or Cutting Class

- Motion *in Limine* to Preclude Introduction of or Reference to Newspaper and Media Articles

- Motion *in Limine* to Preclude Inappropriate and Prejudicial Comments from Plaintiff's Counsel During Trial

- Motion *in Limine* to Preclude the Introduction of Unidentified Photographs

<u>**Memoranda as to Legal Issues of Case**</u>

As set forth in the Pretrial Memorandum of Defendants, Plaintiff cannot establish prima facie claims under Section 1983 against either the School District or Dr. Meisinger, nor can she establish a Title IX claim against the School District.

First, Plaintiff claims, pursuant to Section 1983, that the School District and/or Dr. Meisinger caused a constitutional violation against her.  To make out a claim under Section 1983, Plaintiff must prove that the School District and/or Dr. Meisinger acted under color of state law and that, while doing so, the School District and/or Dr. Meisinger deprived Plaintiff of a constitutional right.  *See* 42 U.S.C. § 1983.  The School District and Dr. Meisinger do not dispute that they acted under color of state law in the school's programs, but TESD did not cause a deprivation of Plaintiff's constitutional right.

Plaintiff claims that TESD is responsible for former instructional aide, Mr. Phillips', violation of her constitutional right.  However, for a municipality, like a school district, to be found liable under Section 1983, the municipality "***itself*** [must] cause[] the constitutional violation at issue."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis added) (internal quotes and citations omitted).  Indeed, a municipality, such as a school district, cannot be liable for the actions of its employees under theories of *respondeat superior* or vicarious liability.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Instead, the government entity's own policy or custom must actually "inflict[] the [constitutional] injury" upon the plaintiff to be held responsible to her.  *See Monell*, 436 U.S. at 694 ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, ***it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent***

*official policy, inflicts the injury that the government as an entity is responsible under §*
*1983."*) (emphasis added).  In other words, an official policy or custom of the local municipality
*must cause* the deprivation of Plaintiff's constitutional right, such that it can be said that the
government entity made "a deliberate choice to follow a course of action" leading to this
deprivation.  *See Canton*, 489 U.S. at 389 (noting that liability under Section 1983 "attaches
where – and only where – a deliberate choice to follow a course of action is made from among
various alternatives by city policymakers.") (internal quotes and citations omitted); *see also*
*Connick v. Thompson*, 563 U.S. 51, 60-62 (2011) (noting local governments are only responsible
"for their *own* illegal acts" under Section 1983) (emphasis in original) (internal quotes and
citations omitted).  Municipal policy includes decisions of the government entity's lawmakers,
acts of policymakers, and "practices so persistent and widespread as to practically have the force
of law." *Connick*, 563 U.S. at 61.

  When a plaintiff argues a municipality is liable by nature of a failure to train, the claim is
at its weakest:  "[T]here are [even more] limited circumstances in which an allegation of a failure
to train can be the basis for liability under § 1983," as the municipality's potential liability "is at
its most tenuous where a [plaintiff's] claim turns on a failure to train." *Canton*, 489 U.S. at 387;
*Connick*, 563 U.S. at 61.  Therefore, the standard that Plaintiff must prove is high and "stringent
standards of culpability and causation must be applied." *Reitz v. Cty. of Bucks*, 125 F.3d 139,
145 (3d Cir. 1997).  Plaintiff must initially identify that the governing body or a policymaker at
the School District made a "deliberate choice" of inaction, essentially resulting in a "*policy of*
*inaction*" – here, meaning that the School District deliberately chose to have an inadequate
training program.  *See Canton*, 489 U.S. 389 (noting a policymaker must make a "deliberate
choice" for liability to attach) (emphasis added); *id.* at 394-95 (O'Connor, J., dissenting, but only

as to remand) (noting where "a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.").

Further, Plaintiff must prove that this alleged inadequate training program equated to deliberate indifference that a violation of Plaintiff's constitutional right to freedom from sexual abuse by a teacher would result.  *See A.M. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 582 (3d Cir. 2004) (citing *Canton*, 489 U.S. at 389-90, for the proposition that "failure to train may amount to a policy or custom that is actionable under § 1983 when in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.") (internal quotes omitted).  To prove that a municipality acted with deliberate indifference, Plaintiff must prove that the failure to train can be equated to "tacit approval" of "an official policy of inaction."  *See Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996) (stating that the elements for a Section 1983 municipal liability claim "under an inaction theory" include "the School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction") (internal quotes and citations omitted).  Deliberate indifference is a high standard; lower standards, such as negligence or recklessness, will not suffice to prove that a municipality can bear responsibility for another's constitutional tort.  *See Canton*, 489 U.S. at 388 (rejecting lower standards of liability).  "'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless,

oversights; *it means evidence showing an obvious, deliberate indifference to sexual abuse.*"
*Claiborne Cty.*, 103 F.3d at 508 (emphasis added).

Therefore, a plaintiff seeking to hold a municipality, like a school district, liable,
particularly under a failure-to-train theory, has a high burden.  She must show that:  (1) the
relevant policymakers knew their employees would confront a specific situation; (2) a pattern of
similar constitutional violations by other untrained employees existed; and (3) should an
employee make the wrong choice in the particular situation, his or her wrong choice "will
frequently cause [the] deprivation of [a student's] constitutional rights."  *Carter v. City of
Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (listing elements); s*ee also Connick*, 563 U.S. at
62 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily
necessary to demonstrate deliberate indifference for purposes of failure to train.") (internal
quotes and citations omitted).

Finally, a plaintiff must also prove that the municipality's alleged deliberate indifference
"actually caused" her resulting constitutional deprivation.  *See Canton*, 489 U.S. at 391
("[R]espondent must still prove that the deficiency in training *actually caused* the [resulting
constitutional deprivation]). (emphasis added); *Doe v. Beaumont I.S.D.*, 8 F. Supp. 2d 596, 607-
08 (E.D. Tex. 1998) ("The Plaintiff must demonstrate a *direct causal link* between the alleged
action and the deprivation of federal rights."  The *Beaumont* court found that there was no
evidence of a requisite policy or custom regarding training, thus the failure to train claim failed.
*Id.* at 608) (emphasis in original) (citation omitted).  It is not enough for a plaintiff to show that
school employees "could have been better trained or that additional training was available that
would have reduced the overall risk of constitutional injury."  *Thomas v. Cumberland Cty.*, 749
F.3d 217, 226 (3d Cir. 2014).

Here, the testimony of TESD employees evidences that TESD's training was not inadequate.  To the contrary, the testimony shows that not only were employees of TESD well-trained, but TESD took immediate and specific measures to enforce training and discipline of its employees the instant that any inappropriate behavior was reported.  To this end, the record reflects that as soon as Dr. Meisinger and administrators were placed on notice of Mr. Phillips' inappropriate behavior, *even before it was averred that the behavior was sexual in nature*, they acted promptly and appropriately by removing him from the school and contacting the authorities.  Dr. Meisinger went so far as to call the police department to determine whether she could report Mr. Phillips for violating the law by allowing Plaintiff to drive his vehicle; *this call was made prior to any allegations of sexual misconduct* between Mr. Phillips and the Plaintiff.  Indeed, as Brett Sokolow, J.D., has opined in this case:  "It is my expert opinion that the District did uphold the requisite standard of care in terms of its response to actual notice, its training both before and after receipt of notice, and in its policies and procedures."

Not only did the District uphold the standard of care, but its actions cannot be said to meet the stringent standards required to make out a showing of "deliberate indifference" and Plaintiff cannot prove the requisite causal link.  The School District is not responsible for Mr. Phillips' tortious actions because he was an employee, and no evidence exists to prove that the School District made "a deliberate choice" to follow a specific course of action in its training that directly led to Plaintiff's constitutional violation.  The School District provided training to its employees regarding their responsibilities and requirements related to potential sexual misconduct, worked to develop and update these policies as needed, and acted promptly when it became aware of any potential employee issues in order to protect the district's students.  Such actions cannot be said to be "an official policy of inaction" or "tacit approval" of violations to

students' constitutional rights.  There is no evidence exhibiting "an obvious, deliberate

indifference to sexual abuse," nor is there evidence showing the requisite "direct causal link" to

the School District's allegedly inadequate training policies.  *See Claiborne Cty.*, 103 F.3d at 508.

As here, it is not enough to establish liability under Section 1983 for a failure to train claim

where a plaintiff argues that school employees "could have been better trained."  *See Thomas*,

749 F.3d at 226.  Plaintiff's claim against the School District must fail.

Plaintiff also seeks to hold Dr. Meisinger liable in her individual capacity as Principal of

Conestoga High School under a theory of supervisory liability for alleged deliberate indifference

for failure to train.  Plaintiff claims that Dr. Meisinger bears responsibility for an instructional

aide's constitutional tort against Plaintiff, but Dr. Meisinger's position alone is not enough to

hold her liable for the actions of another.  Indeed, the law is clear that "supervisors are liable

only for their own acts."  *See Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).  To show

that Dr. Meisinger is somehow responsible under Section 1983 for Phillips' constitutional torts,

Plaintiff must show that Dr. Meisinger *caused* Mr. Phillips to sexually abuse Plaintiff.

To do this, Plaintiff must show that Dr. Meisinger, "with deliberate indifference to the

consequences, established and maintained a policy, practice, or custom which directly caused"

Mr. Phillips to act as he did.  *See A.M.*, 372 F.3d at 586 ("Individual defendants who are

policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate

indifference to the consequences, established and maintained a policy, practice or custom which

directly caused [the] constitutional harm.") (internal quotes and citations omitted).  Therefore, a

plaintiff must prove Dr. Meisinger acted with both (1) deliberate indifference and (2) direct

causation.  *See Black by Black v. Indiana Area Sch. Dist.,* 985 F.2d 707, 712–13 (3d Cir. 1993).

As under the analysis for school district liability, Dr. Meisinger must have known her employees would confront a particular situation, there must have been a pattern of previously similar constitutional violations by untrained employees, and the wrong choice by an employee in that situation must frequently lead to a deprivation of the violated constitutional right.  *See Carter*, 181 F.3d at 357.[1]  Plaintiff also must prove that Dr. Meisinger's alleged deliberate indifference directly led to the deprivation of the constitutional right that was violated.  *See Thomas*, 749 F.3d at 222 (stating Section 1983 liability attaches where the municipal policy itself "is the moving force behind the constitutional tort of one of its employees") (internal quotes and citations omitted); *Reitz*, 125 F.3d at 145 ("To succeed on a § 1983 claim, the party must prove that the training deficiency *actually caused* the injury.") (emphasis added) (citation omitted).

Here, Dr. Meisinger cannot be and is not liable simply by nature of her position as principal of Conestoga High School.  Instead, Dr. Meisinger, in accordance with municipal liability principles, is liable "only for [her] own acts."  *See Wharton*, 854 F.3d at 243.  The record reflects that there is no evidence to show that Dr. Meisinger knew of a need for additional training, much less that Dr. Meisinger exhibited deliberate indifference to that need or caused Plaintiff's resulting constitutional injury.

Finally, Dr. Meisinger is shielded from individual liability by qualified immunity.  Qualified immunity shields government employees sued in their personal capacities from liability unless their conduct violates "clearly established statutory or constitutional rights

---

[1] Comparatively, the Fifth Circuit Court of Appeals has adopted a specific standard for analyzing supervisory liability when a student's right to freedom from bodily integrity has been violated, finding that a plaintiff must show:  (1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate *pointing plainly* toward the conclusion that the subordinate was *sexually abusing* the student; and (2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and (3) such failure caused a constitutional injury to the student. *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 709 (E.D. Pa. 2007) (citing *Doe v. Taylor I.S.D.*, 15 F.3d 443, 454 (5th Cir. 1994)) (emphasis added).

. . . which a reasonable person would have known." *Poe v. Southeast Delco Sch. Dist.*, 165 F.

Supp. 3d 271, 279 (E.D. Pa. 2015). Supervising school officials clearly violate students' rights if

their conduct somehow approves of or assists the abuser's actions. *See Stoneking v. Bradford*

*Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989). Specifically, in *Stoneking*, the court held that

"it was clearly established law that . . . officials may not with impunity maintain a custom,

practice or usage that communicated condonation or authorization of assaultive behavior" and

then denied immunity to two defendants who "discouraged and minimized reports of sexual

misconduct by teachers." *Id.* at 730.

In denying immunity to two defendants who "discouraged and minimized reports of

sexual misconduct by teachers," *Stoneking* drew a distinction between "the mere failure of

supervisory officials to act or investigate," and "affirmative acts" which support a finding of

"toleration, condonation or encouragement of sexual harassment by teachers." *Id.* at 730-31.

The *Stoneking* court found that where claims against a school superintendent amounted to "mere

inaction and insensitivity on his part,", and "the Court [could] not discern from the record any

***affirmative acts*** by [the superintendent] on which [the plaintiff could] base a claim of toleration,

condonation or encouragement of sexual harassment by teachers which occurred in one of the

various schools within his district," the superintendent was entitled to summary judgment on the

basis of qualified immunity. *Id.* at 731 (emphasis added).

Plaintiff also brings a separate claim against the School District pursuant to Title IX,

which forbids discrimination at educational institutions on the basis of sex. Title IX provides in

pertinent part:

> No person . . . shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to
> discrimination under any education program or activity receiving
> Federal financial assistance.

20 U.S.C. §1681(a).

Title IX essentially creates a contract between the federal government and schools that receive federal funding— Congress will provide federal funds and, in return, the schools agree they will not discriminate on the basis of sex in their programs. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Under Title IX, an educational institution can only be found responsible if the school *itself* engages in intentional gender discrimination. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287, 290-92 (1998); *Davis*, 526 U.S. at 642-43. The claim therefore applies only in limited circumstances. *Id.* A school can be found to engage in intentional gender discrimination only where it makes an affirmative decision not to address known, ongoing harassment that an individual is suffering, instead allowing the harassment against the victim to continue unchecked. *See Davis*, 526 U.S. at 645; *Gebser*, 524 U.S. at 290.

In order to make out a claim under Title IX, a plaintiff must prove that (1) an "appropriate person" at the school (2) had "actual knowledge" of the discrimination against the plaintiff in its programs, (3) which discrimination was "so severe, pervasive, and objectively offensive," and (4) the school's response to this discrimination was "deliberately indifferent," and (5) by this deliberately indifferent response, the school subjected the plaintiff to additional harassment, "depriv[ing her] of access to the educational opportunities or benefits provided by the school." *Gebser*, 524 U.S. at 290; *Davis*, 526 U.S. at 650.

First, an "appropriate person" or "official" under the law, must have actual knowledge about the plaintiff's discrimination. An "appropriate person" means one who, "at a minimum," has the authority both to (1) "address the discrimination" of which the official knows, and (2) "institute corrective measures on [the school's] behalf" in response to the known discrimination. *See Gebser*, 524 U.S. at 290. An appropriate person must be an "official" at the school who, at

the relevant time, had the "power to take action to correct discrimination" on the school's behalf.

*See Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005); *see also Noble v. Branch*

*Intermediate Sch. Dist.*, No. 4:01cv 58, 2002 U.S. Dist. LEXIS 19600, at *44-45 (W.D. Mich.

Oct. 9, 2002) (noting in the secondary school context "the appellate courts have required actual

knowledge by the school board itself, the school superintendent, or, at least, a school principal."),

*aff'd*, 2004 U.S. App. LEXIS 22041 (6th Cir. Oct. 22, 2004).

To determine whether an individual is an "appropriate person" under Title IX, courts look

to a person's job responsibilities to determine if he or she has the requisite supervisory authority

over the offending employee such that the person effectively has the power to act for the school

board itself. *See Warren v. Reading Sch. Dist.*, 278 F.3d 163, 172-73 (3d Cir. 2002) (evaluating

principal's job responsibilities, which included supervisory authority to investigate teacher

misconduct). Notably, the Supreme Court of the United States has stated that "it would frustrate

the purposes of Title IX to permit a damages recovery against a school district for a teacher's

sexual harassment of a student based on principles of *respondeat superior* or constructive notice,

*i.e.*, without actual notice to a school district official." *Gebser*, 524 U.S. at 285 (internal quotes

omitted).

Second, "actual notice" must amount to the proper school official having "actual

knowledge of discrimination in the [school district's] programs." *Id.* at 290. It is not enough if a

plaintiff shows that a school district *should have known* if it, in fact, did not know of the

underlying actionable discrimination against her. *See Davis*, 526 U.S. at 642-43 (noting a school

is liable only for its deliberate indifference to acts "of which it had actual knowledge" and

reiterating the Supreme Court's rejection of lower standards of liability under Title IX in

*Gebser*); *Gebser*, 524 U.S. at 285; 290-91 (requiring actual notice). Therefore, a plaintiff must

show that the school district had actual knowledge of the underlying actionable discrimination

against her.  It is not enough if a school knows of lesser conduct that does not amount to

actionable discrimination under Title IX, such as offensive comments.  *See Gebser*, 524 U.S. at

291.

       Third, a plaintiff seeking to make out a Title IX claim must prove that the discrimination

of which the appropriate person had actual knowledge was "so severe, pervasive, and objectively

offensive that it can be said to [have effectively denied Plaintiff] . . . access to the educational

opportunities or benefits provided by the school."  *Davis*, 526 U.S. at 650.  This means that in

order for certain conduct to be "actionable discrimination" under Title IX, the conduct must be

severe, *and* pervasive, *and* objectively offensive.  *Id.* at 633; 650.  "Severe" discrimination

means more than insults, teasing, or inappropriate comments.  *See id.* at 651-52 (noting student-

on-student "insults, banter, teasing, shoving, pushing, and gender-specific conduct that is

upsetting to the students subjected to it" are not enough to be actionable discrimination under

Title IX); *Gebser*, 524 U.S. at 291 (finding that a school's knowledge of a teacher's

inappropriate comments in class was not enough to provide notice of actionable discrimination

under Title IX); *see also Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 620 (6th Cir.

2019) (defining "severe" as "something more than just juvenile behavior among students, even

behavior that is antagonistic, non-consensual, and crass.").  "Pervasive" means the

discrimination is "widespread" or "systemic"; one instance of harassment is not "pervasive."  *See*

*Davis*, 526 U.S. at 652-53 (discussing instances of "severe" harassment that would not *also* be

"pervasive").  Finally, "objectively offensive" discrimination is that which would offend a

reasonable person.  *See Davis*, 526 U.S. at 651 (noting whether "conduct rises to the level of

actionable harassment depends on a constellation of surrounding circumstances, expectations,

and relationships . . . including, but not limited to, the ages of the harasser and the victim and the number of individuals involved.") (internal quotes and citation omitted).

Fourth, a plaintiff must show that the school was deliberately indifferent in its response to the known actionable harassment, meaning that the school's response was "clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.  It is not deliberate indifference where a school's response was merely "flawed," or where a student subjectively disagrees with a school's remedial responses.  *See Strobel v. Neshannock Twp. Sch. Dist.*, Civil Action No. 15-1089, 2018 U.S. Dist. LEXIS 125037, at *19 (W.D. Pa. July 26, 2018) (noting the high standard for Title IX claims and granting defendants' motion for summary judgment because no reasonable juror could find the defendants' response was clearly unreasonable, even if it could be considered "flawed"); *Davis*, 526 U.S. at 648 (stating students have no right to make particular remedial demands from schools).  It is not deliberate indifference merely because a School District fails to follow its internal policies or procedures.  *See Gebser,* 524 U.S. at 291-92 (holding that a school's failure to adopt grievance procedures for resolving sexual harassment claims does not itself constitute discrimination under Title IX).  Instead, for the School District to bear responsibility for the actions of an employee, a plaintiff must prove that the School District made "an official decision . . . not to remedy the [discrimination]" so that it can be said that *the School District itself* intentionally discriminated against the plaintiff because of gender. *See Gebser*, 524 U.S. at 290.  Further, the factual circumstances must show that the school had "substantial control" over the harasser and the context wherein the harassment occurs.  *Davis*, 526 U.S. at 644-45.

Fifth, a plaintiff must prove that the school's deliberately indifferent response "effectively caused . . . [her] discrimination" – meaning – a plaintiff must plead and prove that

*the school's response* caused her to undergo additional actionable harassment (that is, additional harassment that is severe, pervasive, and objectively offensive under the law's definitions). *See Davis*, 526 U.S. at 642-43 (citing *Gebser*, 524 U.S. at 291); *id.* at 649 (finding plaintiff "may be able to show that the Board 'subjected' [the victim] to discrimination by failing to respond in any way over a period of five months to complaints of [the assailant's] in-school misconduct from [the victim] and other female students."); *Bernard v. E. Stroudsburg Univ.*, 700 F. App'x 159, 163 n.3 (3d Cir. 2017) (stating that another potential basis for affirming the district court's decision, had it not been waived, was "that no evidence showed any discriminatory conduct after [the plaintiff] initially reported the alleged sexual abuse and sexual harassment, meaning that there were no injuries that could be causally traced to the [school's] deliberate indifference."). Finally, the additional harassment must have barred Plaintiff from "equal access to education," including educational programs and benefits. *See Davis*, 526 U.S. at 633; 651.

Here, the evidence confirms that Plaintiff fails to establish each and every required element for her Title IX claim. First, Plaintiff cannot (and has not) proven that any "appropriate person" or official at the School District actually knew of the underlying actionable discrimination occurring against Plaintiff in the school's programs before April 18, 2017. Plaintiff has attempted to use inadmissible hearsay to establish that an "appropriate person" had some kind of knowledge about Phillips' relationship with her. However, the record is clear that no admissible evidence exists that any person who could remotely be considered "appropriate" under Title IX, such that he or she had the requisite supervisory authority over Mr. Phillips at the time, knew of his sexual abuse of Plaintiff. Any attempts by Plaintiff to argue that a teacher or anyone in a similar position, who lacked any kind of supervisory power to take action to correct

the discrimination, could constitute an "appropriate person" under Title IX must fail as a matter of law.

Further, no evidence exists to establish that any "appropriate person" had knowledge of Mr. Phillips' sexual abuse of Plaintiff. Even taking Plaintiff's inadmissible hearsay for true (which it is not), she has failed to establish any evidence that anyone knew of the discrimination that she was enduring because of Mr. Phillips before April 18, 2017, as she alleges. No "appropriate person" at the school knew of *any* underlying discrimination against her nor even of any *risk* of underlying discrimination against her before this date, so it must necessarily follow that the School District cannot be said to have known of any *actionable* discrimination against Plaintiff occurring in the school's programs— that is, discrimination that is severe, and pervasive, and objectively offensive. Indeed, no official at the school knew of any such thing.

Finally, Title IX mandates that the analysis of a school's response must occur *after the school has actual knowledge of the underlying actionable discrimination against the complainant*. To analyze otherwise would be to turn Title IX on its head because the statute is predicated (and indeed relies upon) actual notice to the proper school officials such that they will only be held liable for *their response*. That is, a school will only be held liable when the *school's response* to known, actionable discrimination can be said to be deliberately indifferent or "clearly unreasonable." The school's response to this known discrimination must also actually "subject" the Plaintiff to additional actionable harassment and cause her to be "deprive[d] . . . of access to . . . educational opportunities or benefits" that the School District provides. *See Davis*, 526 U.S. at 650. Plaintiff cannot establish any of these elements either; indeed, to the contrary, as soon as the School District had any idea of Phillips' misconduct (arguably before the School District even had the requisite "actual knowledge" of the underlying

actionable discrimination), the district acted promptly, immediately reporting the information to the appropriate authorities.  Mr. Phillips was arrested soon after the School District reported him to the authorities, and he was ultimately charged and convicted.  Therefore, no evidence exists that Plaintiff suffered any additional harassment *after* the school had actual knowledge of Phillips' underlying discrimination against her, let alone any evidence that could show the School District somehow *caused* Plaintiff to undergo additional actionable harassment due to the school's response, or that that additional harassment *caused* by the school somehow resulted in a deprivation of educational benefits or programs.

## IV.    CONCLUSION

The evidence and testimony in this matter will support a finding in favor of the School District and Dr. Meisinger.

Respectfully Submitted,

CONNOR, WEBER & OBERLIES

By: ___/s/ Joseph P. Connor, III_____
        JOSEPH P. CONNOR, III, ESQUIRE
        JULIA M. JACOBELLI, ESQUIRE
        171 West Lancaster Avenue
        Paoli, PA 19301
        (610) 640-2800 - phone
        (610) 640-1520 – fax
        jconnor@cwolaw.com
        jjacobelli@cwolaw.com
        Attorneys for Defendants,
        Tredyffrin Easttown School District
        and Amy A. Meisinger

Dated:  March 16, 2021